1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Jose L. Ramirez,                    )        No. CV 08-00521-TUC-FRZ (JCG)
                                        )
10              Plaintiff,              )        **REPORT & RECOMMENDATION**
                                        )
11  vs.                                 )
                                        )
12                                      )
    Michael J. Astrue,                  )
13                                      )
                Defendant.              )
14                                      )
                                        )
15  _____   )

16         The plaintiff filed this action for review of the final decision of the Commissioner for

17  Social Security pursuant to 42 U.S.C. §§ 405(g).  The case has been referred to the United

18  States Magistrate Judge pursuant to the Rules of Practice of this Court.

19         Pending before the court is an opening brief filed by Plaintiff on June 29, 2009 (Doc.

20  No. 14), a response brief filed by Defendant on July 28, 2009 (Doc. No. 17) and a reply filed

21  by Plaintiff on August 24, 2009.  (Doc. No. 20.)

22         The Magistrate Judge recommends that the District Court, after its independent

23  review, deny the relief requested by Plaintiff.

24

25

26

27

28

# PROCEDURAL HISTORY

On April 7, 2004, Plaintiff filed an application for disability insurance benefits, alleging a disability that began on May 8, 2003.[1]  (AR 40.)  A hearing on Plaintiff's application was held on February 22, 2006 before Administrative Law Judge (ALJ) Milan M. Dostal.  (AR 40.)   Plaintiff testified at the hearing.  (AR 980.)  The ALJ also heard testimony from vocational expert Stacie Schonbrun.  (AR 1005.)  On October 23, 2006, the ALJ issued a decision denying Plaintiff's application.  (AR 40-46.)  Plaintiff filed a request for review, which the Appeals Council denied on July 31, 2008.  (AR 10-13.)

On September 25, 2008, Plaintiff filed a complaint in U.S. District Court, appealing the Commissioner's final decision denying his application pursuant to 20 C.F.R. §§ 404.981, 416.1481.  (Doc. No. 1.)

# CLAIMANT'S WORK HISTORY

Plaintiff was born on October 11, 1965.  (AR 932.)  He has a high school education and attended college for two years.  (AR 933.)  Plaintiff has an associates degree in film and television production.  (AR 933.)

From early 2002 until May, 2003, Plaintiff worked at the America Online call center. (AR 984.)

From May, 2003 until July or August, 2005, Plaintiff was mostly out of work, although he found some work as a photographer.  (AR 981, 983.)

From July or August, 2005 until September, 2005, Plaintiff worked as a customer service representative at Afni Call Center.  (AR 983.)

From October, 2005 until January, 2006, Plaintiff worked as a customer service representative for the Arizona Mail Order call center.  (AR 981.)

---

[1] The Administrative Record in this matter is cited as "AR."  This was Plaintiff's second application for disability benefits.  Plaintiff was previously granted a closed period of disability benefits commencing 8/20/99 and ending 1/31/02.  (AR 600-606.)  Records relating to the first application were included in the Record.

In January, 2006, Plaintiff began working as a telephone customer service representative for Citi Cards. (AR 980.)

## PLAINTIFF'S MEDICAL HISTORY

Plaintiff claims that he suffers from low back pain,[2] hand pain, migraine headaches, urological problems and mental health disorders.[3]

1.    Plaintiff's Hand Pain

Plaintiff was treated for symptoms related to nerve compression and de Quervain's syndrome[4] in his right hand beginning in December, 1993. (AR 319-322.)

On January 23, 2001, Dr. Kurt Reinke opined that it was difficult to determine which of Plaintiff's symptoms were attributable to bilateral tendonitis and which were caused by de Quervain's syndrome. (AR 586.) On February 19, 2001, in consultation with Dr. Reinke, Plaintiff elected to undergo hand surgery. (AR 586.)

On January 30, 2002, Dr. Reinke performed surgery on Plaintiff's right hand. (AR 571-573.) At a follow-up appointment on February 19, 2002, Dr. Reinke opined that Plaintiff's discomfort was decreasing. (AR 570.) At a March 19, 2002 follow-up, Dr. Reinke noted that Plaintiff still had swelling but his condition had improved; he recommended a 4-week course of hand therapy. (AR 569.) In May, 2002, Dr. Reinke opined

_____

[2] Plaintiff testified to some low back pain during the hearing. Although Plaintiff claims that he was diagnosed with a back deformity in 1992 (Doc. No. 14, pg. 2), he did not provide medical records in support; the copy of the one medical record cited is illegible. (AR 481.) The Court notes that the Administrative Record shows that the ALJ evaluating Plaintiff's first application for benefits found that Plaintiff's medical history included complaints of low back pain (AR 601) and that lumbar spine x-rays revealed discogenic spondylosis and osteoarthritis involving the uncovertebral joints. (AR 602.)

[3] Plaintiff's Statement of Facts contained some assertions which were unsupported; citations to the record in support of the assertions were inaccurate. For example, on pg. 5 of his Opening Brief, Plaintiff stated "Plaintiff had problems keeping jobs and would lose his job secondary to chronic and persistent problems with focus and concentration, sustaining attention. (Tr. 513, 530)." (Doc. No. 14.) Pages 513 and 530 of the administrative record do not support that statement.

[4] De Quervain's syndrome is an inflammation of the tendons of the thumb which causes pain at the base of the thumb. *See* http://www.webmd.com/rheumatoid-arthritis/de-quervains-disease.

that Plaintiff's condition had not changed significantly and that it would be up to Plaintiff whether he felt he could work in his condition. (AR 568.)

On August 14, 2002, Dr. Levine examined Plaintiff for pain in his left hand. (AR 564.) She diagnosed Plaintiff with mild carpal tunnel. (AR 564.)

On August 20, 2002, Dr. Reinke treated Plaintiff for pain in the index and middle finger of his left hand. (AR 562.) Dr. Reinke opined that Plaintiff was suffering from nerve compression and recommended that Plaintiff refrain from working until his diagnosis could be confirmed with electrical tests. (AR 562.)

On December 16, 2002, Plaintiff reported to Dr. Levine that his carpal tunnel was painful and it was difficult for him to work more than 4 hours per day. (AR 907.) Dr. Levine noted probable carpal tunnel in Plaintiff's left hand but "doubted" that Plaintiff suffered from carpal tunnel in his right hand. (*Id.*)

On December 23, 2002, Dr. Weidman performed an EMG of Plaintiff's hands; Dr. Weidman found "very mild carpal tunnel syndrome and very mild Guyon's canal syndrome" in both hands. (AR 862.) Based on the EMG, Dr. Levine filled out a fitness-for-duty certification allowing Plaintiff to return to work. (AR 863.)

On January 7, 2003, Dr. Levine noted that Plaintiff was still suffering from chronic de Quervain's syndrome. (AR 834.) Plaintiff reported that he could not work an 8-hour shift. (AR 834.)

On January 21, 2003, Dr. Reinke reviewed Plaintiff's electrical tests and diagnosed Plaintiff with "very mild nerve compression." (AR 847.) Plaintiff reported to Dr. Reinke that he felt better and was not interested in pursuing anything at this point; Dr. Reinke agreed with Plaintiff. (AR 847.)

On March 11, 2003, Dr. Jena treated Plaintiff for tendonitis. (AR 906.) She recommended that Plaintiff take four weeks off work until he could receive follow-up care from Dr. Reinke. (*Id.*)

On March 25, 2003, Plaintiff reported to Dr. Reinke that he was still suffering from recurrent hand pain. (AR 843.) Plaintiff reported that his hand problems were made worse

by use of a keyboard and mouse. (*Id.*) Dr. Reinke could not identify a clear diagnosis for Plaintiff's symptoms and did not think that Plaintiff's symptoms were worsening. He further stated that splinting could worsen Plaintiff's symptoms, and that Plaintiff should work within the limits of his discomfort if he returned to work. (*Id.*) Plaintiff reported to Dr. Reinke that he believed his symptoms were stable and he wanted to return to work. (Id.)

On April 9, 2003, pain specialist Dr. Bullock treated Plaintiff's hand pain. (AR 868.) Dr. Bullock observed tenderness along Plaintiff's wrists but observed that Plaintiff had good grip strength and there did not appear to be any wasting. (AR 845.) He prescribed pain medication but commented that he did not think he could do much to help Plaintiff. (*Id.*)

On May 15, 2003, Dr. Reinke completed a form certifying that Plaintiff was permanently incapacitated due to tendonitis and carpal tunnel syndrome. (AR 724.)

On July 10, 2003, Dr. Levine opined that Plaintiff could work only part-time and only in a job that did not require repetitive hand movements. (AR 868.)

On July 22, 2003, Dr. Levine noted that Plaintiff continued to report tendonitis pain; Plaintiff told Dr. Levine that he could not work at a keyboard for more than 15 or 20 minutes without pain. (AR 906.)

On October 21, 2003, Dr. Reinke opined that Plaintiff was disabled.[5] (AR 869). Dr. Reinke stated that Plaintiff was unable to use his hands and therefore could not climb. Dr. Reinke further opined that Plaintiff could sit, walk, stand, lift & carry for a maximum of two hours in an eight hour work day. (*Id.*)

On July 6, 2004, Dr. Reinke saw Plaintiff for a follow-up exam of his tendonitis. He observed that Plaintiff's symptoms had improved and did not recommend any further treatments or diagnostic studies. (AR 870).

In August, 2004, Dr. Reinke opined that Plaintiff was completely disabled due to tendonitis, de Quervain syndrome and carpal tunnel syndrome. (AR 791.)

---

[5] This form is unsigned but it appears that it was sent to Dr. Reinke by a disability insurance carrier and completed by Dr. Reinke. The ALJ mistakenly attributed this report to Dr. Levine. (AR 45.)

On September 28, 2004, Dr. Enrique Suarez examined Plaintiff pursuant to Plaintiff's disability insurance claim; his impression was tendonitis without objective findings. (AR 830.) Dr. Suarez opined that Plaintiff could lift 30-40 pounds occasionally and 25-30 pounds frequently, and would have no limits in sitting, standing, walking, reaching, fingering or handling. (AR 830.)

On October 12, 2004, Plaintiff's medical records were reviewed by a state agency physician who opined that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday and would be limited in his upper extremities with regard to pushing and/or pulling. (AR 821.)

At a follow-up appointment with Dr. Reinke in March, 2005, Plaintiff reported that he could not use his hands for more than an hour without experiencing pain and numbness. (AR 708.) Dr. Reinke described Plaintiff's condition as stable and recommended that Plaintiff continue with nonsteroidal anti-inflammatories. (*Id.*)

On June 20, 2005, Plaintiff's medical records were reviewed by a state agency physician who opined that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday and would not be limited with regard to pushing and/or pulling. (AR 734.)

On March 6, 2006, Dr. Levine treated Plaintiff for elbow pain. Plaintiff reported pain in his upper back, shoulder and wrists. (AR 900.)

On September, 18, 2006, Dr. Alfaro opined that Plaintiff had suffered from a recurrence of his de Quervain's syndrome in 2005. (AR 916.) He recommended that Plaintiff wear splints and continue taking his anti-inflammatory medication. (*Id.*)

2.    Plaintiff's Migraines

On December 19, 2001, Dr. Jena treated Plaintiff for migraine headaches. (AR 566.) Dr. Jena prescribed Imitrex and Oxycontin. (AR 566.)

On January 31, 2002, Plaintiff reported to Dr. Levine that the medications he was taking for migraines provided him relief about half of the time. (AR 566.) Plaintiff reported that he suffered from 1 to 7 migraine headaches per month. (AR 566.)

On September 29, 2004, Dr. Suarez noted that Plaintiff was experiencing migraines 1-4 times per month and having good results with his migraine medications. (AR 830.)

In January, 2006, Plaintiff received treatment from Dr. Levine for migraines, which he reported experiencing 4-8 times per month. (AR 902.) Dr. Levine prescribed Imitrex, noting that Plaintiff had previously received relief from it. (AR 903-04.) In a March 1, 2006, letter, Dr. Levine stated that Plaintiff had not followed up with her regarding his migraines and therefore she could not comment on whether the medication had helped him. (AR 897.)

3.    Plaintiff's Urological Symptoms

On December 11, 2002, Dr. Daniel Karsch noted that Plaintiff had suffered from kidney stones since 1991, probably due to a decompensated bladder. (AR 853.)

On March 6, 2006, Plaintiff reported improvement in his genitourinary symptoms, but also reported recently passing kidney stones. (AR 899.)

4.    Plaintiff's Mental Condition

Plaintiff was treated at Southern Arizona Mental Health Services from April 5, 2001 through June, 2001. (AR 505-551.) In March, 2001, Plaintiff reported an improvement in his mood and general sense of well-being. (AR 445.) Plaintiff was diagnosed with severe dysfunction with role performance and feelings. (AR 530.) On May 10, 2001, Plaintiff complained that he suffered from migraines, being irritable, and not being able to function. (AR 542.) On June 25, 2001, Plaintiff was diagnosed with an anxiety disorder and depression. (AR 538.) By September 4, 2001, his mental health records noted that Plaintiff was very much improved. (AR 514.)

In July, 2001, psychologist Francisco Sanchez, PhD diagnosed Plaintiff with a personality disorder. (AR 493-97.)

On October 27, 2004, Plaintiff presented to Dr. Markovich, M.D. of COPE Behavioral Health Services, Inc. for mental health treatment. (AR 778.) Plaintiff reported

depression and anxiety in the past, and stated that at present his tendonitis prevented him from working. (AR 778.) Dr. Markovich found Plaintiff to be pleasant and motivated. (Id.) He started Plaintiff on Lexapro; Plaintiff subsequently reported that Lexapro decreased his anxiety. (AR 782.)

On November 23, 2004, Dr. Sanchez diagnosed Plaintiff with a bipolar disorder, somatization disorder and a personality disorder. (AR 815.) Dr. Sanchez noted that Plaintiff rode his bicycle 4 miles to the appointment, could ride the bus, cook for himself and was currently working 12 hours per week at Telemundo. (AR 813-14.) Dr. Sanchez opined that Plaintiff could continue to work as long as he remained compliant with medication treatment and psychiatric treatment and received intervention from case management. (*Id*.) Dr. Sanchez further opined that although Plaintiff could perform basic work-related activities, his prognosis was poor and Dr. Sanchez did not believe that Plaintiff could sustain his current level of functioning beyond a 12-month period. (*Id*.) Dr. Sanchez completed a Medical Source Statement of Ability to do Work Related Activities for the Arizona Department of Economic Security, in which he opined that Plaintiff's mental functioning was unpredictable and irreversible due to somatization. (AR 817.) Dr. Sanchez stated that Plaintiff was moderately limited in his ability to understand and carry out instructions, understand and remember short and simple instructions and carry out detailed instructions. (*Id*.) He stated that Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances and sustain an ordinary routine without special supervision. (*Id*.) According to Dr. Sanchez, Plaintiff was moderately to markedly limited in his ability to work in coordination or proximity without being distracted. (AR 817.) He further stated that Plaintiff's ability to make simple work decisions would deteriorate over time, Plaintiff would require an increasing number of rest periods and Plaintiff would not be predictable or reliable. (AR 819.)

At a COPE appointment in January, 2005, Plaintiff reported that he enjoyed hiking and photography and wanted to return to work or school. (AR 775.)

On April 5, 2005, Plaintiff reported to his COPE counselor that he was doing well, was spending time doing photography, and wanted to return to work. (AR 896.)

On June 28, 2005, state agency psychologist Paul Tangeman, Ph.D reviewed Plaintiff's records and noted that Plaintiff would be moderately limited in the ability to complete a normal workweek and to respond appropriately to changes in work setting, but would not be otherwise limited. (AR 741-42.) Dr. Tangeman noted that Plaintiff received treatment from COPE and had improved with medication. (AR 743-44.)

In July, 2005, Plaintiff received treatment at COPE. (AR 895.) He was diagnosed with a depressive disorder and agoraphobia. (*Id*.) Plaintiff told his counsel that he believed his Celexa prescription was helping him. (*Id*.)

In November, 2005, Plaintiff reported that an increased dosage of his Celexa prescription had helped him. (AR 893.)

In April, 2006, Dr. Nelson, PhD, evaluated Plaintiff's neurobehavioral health. (AR 917-922.) Dr. Nelson diagnosed Plaintiff with psychological issues related to a general medical condition. (AR 920). She noted Plaintiff's history of major depressive disorder and noted that a generalized anxiety disorder would need to be ruled out. (*Id*.) She also noted Plaintiff's chronic tendonitis, migraine and low back pain. (*Id*.) Plaintiff denied significant symptoms of depression, and Dr. Nelson opined that Plaintiff's depression was secondary to his work-related problems. (AR 917-18.) Dr. Nelson recommended that Plaintiff's work schedule be modified such that Plaintiff could work a full-time schedule with sufficient time for recovery between shifts. (AR 921.)

## **PLAINTIFF'S TESTIMONY**

At the hearing before the ALJ, Plaintiff testified that he currently takes ibuprofen for pain in his hands, wrists and elbows as well as Ativan and Celexa for anxiety and depression. (AR 990-91, 999.) He reported pain in his shoulders and low back as well. (AR 991.) Plaintiff testified that he experiences pain in his hand or wrist almost every day. (AR 993.) He prepares his meals by microwave or his roommates prepare food for him. (AR 994.) He does not engage in social activities. (*Id*.) He is able to drive. (AR 995.) He described a

period when he wasn't working and was very depressed and just stayed at home. (*Id.*) Plaintiff also testified that during episodes of agoraphobia, he becomes too anxious to leave the house. (AR 997.) Those episodes may last a few hours or a few days. (*Id.*) Plaintiff testified that his hand pain and his depression prevent him from working. (AR 999.)

## TESTIMONY OF VOCATIONAL EXPERT

Stacie Schonbrun testified as the vocational expert in Plaintiff's case. (AR 1004.) Ms. Schonbrun testified that Plaintiff's past relevant work in customer service was semi-skilled. (AR 1005.) She also testified that Plaintiff had past relevant unskilled work as a furniture driver and janitor. (AR 1008.) In responding to various hypotheticals, Ms. Schonbrun testified that a person with Plaintiff's limitations and work experience could perform Plaintiff's past relevant work as a customer service clerk or photographer, assuming the limitations were mild or moderate. (AR 1008.) Ms. Schonbrun further testified that if the limitations were severe, such that the person could not control his/her pain or psychiatric problems with medication, the person would not be able to perform Plaintiff's past relevant work. (AR 1009.) Ms. Schonbrun further testified that if the limitations were severe, there would be no other kind of work in the national economy that the person would be capable of doing. (*Id.*) Ms. Schonbrun further testified that a person with continuous hand pain, significant agoraphobia and depression would not be able to perform any work in the national labor economy. (AR 1011.)

## CLAIM EVALUATION

Social Security Administration (SSA) regulations require that disability claims be evaluated pursuant to a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step two which requires a determination of whether the claimant has a medically severe "impairment or combination of impairments." 20 C.F.R. §§ 404.1520(c), 416.920(c).

In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limits or restricts his or her "physical or mental ability to do basic work activities." *Id*. If the ALJ concludes the impairment is not severe, the claim is denied. *Id*. Upon a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled, and no further inquiry is necessary. *Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir. 1993) (citations omitted). If the claimant's impairment does not meet or equal a listed impairment, evaluation proceeds to the next step.

The fourth step requires the ALJ to consider whether the claimant has sufficient RFC[6] to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the ALJ concludes the claimant has sufficient RFC, then the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

**THE ALJ'S FINDINGS**

The ALJ analyzed Plaintiff's claim of disability according to the five-step procedure. At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 8, 2003. (AR 42.) At step two of the analysis, the ALJ concluded that Plaintiff suffered from the following severe impairments: tendonitis, migraines and major depressive disorder. (*Id*.) At step three, the ALJ determined that Plaintiff's

---

[6] Residual functional capacity is defined as that which an individual can still do despite his limitations. 20 C.F.R. § 404.1545.

impairments did not meet or equal one of the impairments listed in the Social Security regulations. (Ar 42-43.)    At step four, the ALJ concluded that, on or before his date last insured, Plaintiff had RFC to: lift and carry 20 pounds occasionally and 10 pounds frequently; grasp and grip on an occasional basis; and sit, stand and/or walk for about 6 hours in an 8-hour day. (AR 43.)  The ALJ found Plaintiff's statements concerning the intensity, duration and limiting effect or his symptoms to be not entirely credible.  The ALJ also gave little weight to the opinions of Drs. Levine and Reinke.  (AR 45.)  The ALJ concluded that Plaintiff had sufficient RFC to perform his past relevant work as an customer service representative.  (AR 46.)  Because the ALJ concluded that Plaintiff had sufficient RFC, Plaintiff's claim was denied at step four of the review.

## STANDARD OF REVIEW

An individual is entitled to SSI disability benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.  42 U.S.C. § 1382c(a)(3)(A).  "A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy."  *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir. 1993) (quoting *Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work.  *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984) (citing *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir.1984)).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are meant to be conclusive.  42 U.S.C. §§ 405(g), 1383(c)(3).  The court may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016,

1019 (9th Cir. 1992) (citation omitted). The Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citations omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1987). The standard is "less than a preponderance" of the evidence standard. *See Matney,* 981 F.2d at 1019.

"[I]f the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019. When applying the substantial evidence standard, however, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Id.* A denial of benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing the evidence even though the findings may be supported by substantial evidence. *Frost v. Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002); *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

In evaluating evidence to determine whether a claimant is disabled, the opinion of a treating physician[7] is entitled to great weight. *Ramirez v. Shalala,* 8 F.3d 1449, 1453-54 (9th Cir. 1993) (citations omitted). The Commissioner may reject a treating physician's uncontradicted opinion only if he sets forth clear and convincing reasons for doing so. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991)); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is contradicted by another doctor, the Commissioner may reject that opinion only if he provides specific and legitimate reasons supported by substantial evidence

---

[7] The term "physician" includes psychologists and other health professionals who are not medical doctors. *Lester v. Chater*, 81 F.3d 821, 830 n.7 (9th Cir. 1995).

- 13 -

in the record. *Lester,* 81 F.3d at 830 (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). No distinction is drawn "between a medical opinion as to a physical condition and a medical opinion on the ultimate issue of disability." *Rodriguez v. Bowen*, 876 F.2d 759, 761 n.7 (9th Cir. 1989).

When medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). The Commissioner's finding that a claimant is less than credible, however, must have some support in the record. *See Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792-93 (9th Cir. 1997).

**DISCUSSION**

Plaintiff challenges the ALJ's decision on four grounds: (1) the ALJ erred in giving little weight to the opinions of mental health professionals who had treated Plaintiff and greater weight to the opinion of the non-treating state agency psychologist; (2) the ALJ erred in giving little weight to the opinions of treating physicians Levine and Reinke; (3) the ALJ failed to provide clear, convincing reasons for rejecting Plaintiff's testimony; and (4) the ALJ improperly relied on the testimony of the vocational expert.

**1.  The ALJ did not err in giving little weight to the opinions of mental health professionals who had treated Plaintiff and greater weight to the opinion of non-treating state agency psychologist.**

The ALJ concluded that Plaintiff's psychiatric treatment records did not support the alleged intensity, duration or severity of Plaintiff's alleged psychological symptoms. (AR 44.) In so concluding, the ALJ gave little weight to the opinion of treating psychologist Dr. Sanchez, finding that the restrictions recommended by Dr. Sanchez were not supported by his own exam findings. (AR 45.) The ALJ also gave little weight to the opinion of the COPE treating psychologist, noting that COPE's assessment of Plaintiff's ability to work was based on Plaintiff's own reporting. (*Id*.) Another opinion from COPE was rejected as not being from an acceptable medical source. (*Id*.) The ALJ relied on the opinion of the Disability Determination Service psychologist, Dr. Tangeman. (AR 45.)

If the treating physician's opinion is contradicted by another doctor, the Commissioner may reject that opinion only if he provides specific and legitimate reasons supported by substantial evidence in the record. *Lester,* 81 F.3d at 830 (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). In this case, the ALJ provided specific and legitimate reasons for rejecting the opinions of Dr. Sanchez and the COPE psychologist in favor of the opinion of Dr. Tangeman. As the ALJ noted, Dr. Sanchez's recommended restrictions were not supported by his own exam findings. In November, 2004, Dr. Sanchez completed a Medical Source Statement of Ability to Do Work Related Activities (Mental) in which he stated that Plaintiff was moderately limited in every mental and emotional capability listed. (AR 816.) However, his exam notes from that same date note that Plaintiff scored a 30/30 on the Mini-Mental Health Status Exam and state that "as long as [Plaintiff] remains complaint with medication treatment and psychiatric treatment, and also received intervention from case management, client should be able to perform basic work related activities."[8] (AR 815.) The ALJ was also correct in noting that the COPE assessment of Plaintiff's ability to work was based on Plaintiff's own reporting: it states that Plaintiff's functional work status was "assessed per patient." (AR 894.) Finally, the ALJ was correct in noting that the COPE cover letter opining that Plaintiff was disabled and could not work was not from an acceptable medical source. (AR 780.)

In addition, Dr. Tangeman's opinion was consistent with other evidence in the record. Dr. Tangeman opined that Plaintiff's mental impairments appeared to be well-controlled by medication. (AR 743.) The COPE records support this finding: in November, 2004 Plaintiff reported experiencing less anxiety since starting Lexipro (AR 782); in April 2005 the treating psychologist at COPE noted that Plaintiff was doing well on his current medications and his

---

[8] Dr. Sanchez opined that Plaintiff was able to perform basic work related activities with the caveat that he did not believe Plaintiff would be able to sustain his current level of functioning. (AR 815.) This prediction proved to be incorrect, as COPE records from November 4, 2005 document that Plaintiff had continued to take his medications and remained stable. (AR 893). Dr. Nelson's examination in April, 2006 also documented that Plaintiff was in stable condition and able to work. (AR 917-22.)

mood and anxiety were okay (AR 773); and in November, 2005 Plaintiff reported that his increased dosage of Celexa was helping his symptoms. (AR 893.)  *See Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.")  Dr. Tangeman also opined that Plaintiff had adequate social skills and was independent in all activities of daily living. (AR 743.)  Dr. Nelson, a treating psychologist, noted that Plaintiff was "extroverted and makes friends quickly ... very conventional and conforming to societal standards." (AR 919). *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that a consultative examiner's opinion alone constitutes substantial evidence).  Plaintiff testified regarding his independence in activities of daily living and reported the same to Dr. Sanchez.  (AR 994-95, 814.)  Finally, Dr. Tangeman's conclusion that Plaintiff had RFC to perform work with only moderate limitations in his ability to complete a normal work week and his ability to respond to changes in the work setting (AR 742) was supported by records from COPE and Dr. Nelson.  Records from COPE indicate that Plaintiff repeatedly told his counselor that he wanted to go back to work and his counselor encouraged Plaintiff's efforts to engage in meaningful work.  (AR 773, 775, 992.)  Dr. Nelson opined that Plaintiff could work full time if he received minor accommodations. (AR 917-19, 921.)

In sum, the ALJ's gave specific and legitimate reasons for acceptance of the non-treating physician's opinion and those reasons were supported by substantial evidence in the record.

**2.      The ALJ did not err in giving little weight to the opinions of treating physicians Levine and Reinke.**

Plaintiff contends that the ALJ afforded too much weight to the opinion of treating physician Suarez and gave too little weight to the opinions of treating physicians Levine and Reinke.  Review of the record, however, demonstrates that the ALJ's conclusion was supported by substantial evidence.

The ALJ rejected the state agency physicians' findings that Plaintiff is capable of work activity at the medium exertional level, and instead adopted the more restrictive opinion of Dr. Suarez, who opined that Plaintiff would be able to lift 35-40 pounds occasionally and 25-30 pounds frequently, stand/walk/sit with no limitations, reach/handle/finger with no limitations, and travel with no limitations. (AR 830.) In so holding, the ALJ gave little weight to the opinions of Drs. Levine and Reinke. In July, 2003, Dr. Levine opined that Plaintiff could work only part-time, would be restricted from repetitive hand movements, and could not repeatedly lift over 20 pounds. (AR 868.) On October 21, 2003, Dr. Reinke opined that Plaintiff was disabled. (AR 869.) Dr. Reinke stated that Plaintiff was unable to use his hands and therefore could not climb. Dr. Reinke further opined that Plaintiff could sit, walk, stand, lift & carry for a maximum of two hours in an eight hour work day. (*Id.*) In August, 2004, Dr. Reinke opined that Plaintiff was completely disabled due to tendonitis, de Quervain syndrome and carpal tunnel syndrome. (AR 791.) The ALJ concluded that the opinions of Drs. Levine and Reinke were overly restrictive given the very mild findings on diagnostic testing and minimal objective findings. (AR 45.)

The ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the opinions of Dr. Levine and Reinke in favor of the opinion of Dr. Suarez. *Lester,* 81 F.3d at 830 (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). As the ALJ noted, the opinions of Drs. Levine and Reinke were inconsistent with Plaintiff's EMG, which showed "very mild abnormalities consistent with very mild nerve compression syndromes." (AR 847.) In addition, neither Dr. Levine's nor Dr. Reinke's objective findings supported their disability assessments. In July, 2003, when Dr. Levine opined that Plaintiff would be restricted from working due to his hand pain, Dr. Levine's exam notes state "good grip strength. No problem with dorsiflexion, resisted pronation or supination. No swelling or wasting of the thenar eminence." (AR 832.) Dr. Levine's notes from November and December, 2002 contain similar exam findings. (AR 833-34.) In July, 2004, Dr. Reinke found that Plaintiff's symptoms had improved. (AR 870.) On examination, Dr. Reinke found "no sign of intrinsic waste. The strength is intact and

symmetric," and concluded "I would not recommend any further treatments or diagnostic studies. He should continue on [non-steroidal anti-inflammatory medication]." (AR 870.) Finally, Dr. Suarez's September, 2004 exam notes state that Plaintiff's nerve test results were normal, his hand grip was strong, he showed no signs of muscle atrophy and he had normal range of motion in both hands. (AR 829.)

### 3. The ALJ provided clear, convincing reasons for rejecting Plaintiff's testimony.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an [underlying] impairment or impairments" and "show that the impairment or combination of impairments could reasonably be expected to (not that it did in fact) produce some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (citations omitted). "The claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof." *Id.* "Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom." *Id.* "Finally, the claimant need not show that her impairment could reasonably be expected to cause the *severity* of the symptom she has alleged; she need only show that it could reasonably have caused *some* degree of symptom." *Id.* (emphasis added). This approach to the evaluation of a claimant's testimony "reflects the highly subjective and idiosyncratic nature of pain and other such symptoms." *Id.*

Once a claimant produces medical evidence of an underlying impairment that is reasonably likely to be the cause of some pain, the ALJ "may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991). Although an ALJ "cannot be required to believe every allegation of disabling pain," *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989), the ALJ cannot reject testimony of pain without making findings sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Bunnell*, 947 F.2d at 345-46 (citing *Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1215 (9th Cir. 1991)). There are a number of factors the ALJ must consider to determine the credibility of the claimant's

allegations of disabling pain. These factors are: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (*e.g.*, movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id.* at 346 (citing SSR 88-13). The ALJ may also consider: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Smolen*, 80 F.3d at 1284. If "there is no affirmative evidence suggesting [the claimant] is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so." *Id*. at 1283-84.

In the present case, the ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony regarding his pain. First, the ALJ accurately observed that the clinical and laboratory findings, as well as psychiatric treatment records, appeared to be disproportionate to the severity of pain and symptoms alleged. Plaintiff's EMG results showed "very mild abnormalities consistent with mild nerve compression." (AR 847.) Plaintiff's treating physicians repeatedly noted that Plaintiff had good grip strength, normal test results, improved symptoms and normal range of motion. (AR 832-34, 870, 22.) The examining state agency physician likewise noted no objective findings consistent with Plaintiff's reports of pain. (AR 829.) Plaintiff's COPE counselor encouraged Plaintiff to pursue employment. (AR 892.)

Second, the ALJ correctly noted that the record demonstrates large gaps of time between visits to a health care professional. When Dr. Levine treated Plaintiff in January, 2006, she noted that she had not seen him in several years. (AR 897.) Dr. Reinke treated Plaintiff in March, 2003; Plaintiff cancelled his appointment with Dr. Reinke in July, 2003 and did not see Dr. Reinke again until July, 2004 (at which time conservative care and a one-

year follow up was recommended).  (AR 865, 870.)  Plaintiff contends that the ALJ should have attributed Plaintiff's failure to obtain medical treatment to his psychiatric problems: Plaintiff notes that Dr. Sanchez found Plaintiff to be markedly limited in his ability to maintain regular attendance and be punctual.[9]  (AR 817.)  However, as noted above, the ALJ appropriately gave little weight to Dr. Sanchez's opinion.

In addition, the court may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992) (citation omitted).  "[I]f the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Id.* at 1019.  In this case, the ALJ's finding that there were periods of time where Plaintiff was not receiving medical care was supported by substantial evidence.  Moreover, Plaintiff's lengthy medical history documents that Plaintiff, despite his psychiatric condition, has been able to seek out and obtain medical care when needed.  Accordingly, the Magistrate Judge concludes that the ALJ was justified in noting gaps in Plaintiff's medical care as one factor suggesting that Plaintiff's reports of pain were not credible.

Third, the ALJ was correct in finding that the treatment recommended by Plaintiff's physicians was conservative, consisting primarily of pharmacological and palliative remedies.  Plaintiff reported using ibuprofen for his pain to Drs. Suarez and Nelson, as well as the ALJ.  (AR 828, 918, 990.)  Dr. Reinke consistently recommended non-steroidal anti-inflammatory medication to treat Plaintiff's hand pain.  (AR 708, 870).  Dr. Bullock, the pain specialist who treated Plaintiff, recommended against narcotic pain relievers.  (AR 845.) *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (affirming ALJ's decision to reject claimant's testimony in part because claimant's statement that she experienced pain

---

[9] Plaintiff also argues that his failure to obtain medical treatment is attributable to his lack of insurance. (Doc. No. 14, pg. 992.) However, Plaintiff's only factual support for his assertion that he did not receive medical care due to lack of insurance was his testimony that in 2005, he did not receive treatment for a rotator cuff injury because he became uninsured.  The rotator cuff injury is not relevant to this disability claim.

approaching the highest level imaginable was inconsistent with the minimal, conservative treatment that she received).

Fourth, the ALJ pointed out the numerous exams in which physicians observed no evidence of atrophy or wasting. The ALJ's finding was supported by substantial evidence: Drs. Suarez, Levine and Reinke all noted an absence of wasting and/or atrophy during examinations of Plaintiff's hands. (AR 829, 832, 870.) Contrary to Plaintiff's assertion, absence of atrophy or wasting of muscle is a valid reason to discredit claims of inactivity caused by disabling pain. *See Meanel*, 172 F.3d at 1114.

Finally, the ALJ properly considered Plaintiff's daily activities in evaluating Plaintiff's credibility. The record demonstrates that Plaintiff is able to ride the bus or his bicycle for transportation, cook, manage his finances and perform other activities of daily living. (AR 814, 893, 919, 994-995.) Plaintiff also reported that he enjoyed hiking and photography. (AR 775.) *See Morgan v. Apfel*, 169 F.3d 595, 600 (9th Cir.1999) (claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child was evidence of claimant's ability to work). In addition, Plaintiff often worked part-time during the alleged period of disability. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) (ALJ may consider part-time work as a daily activity undermining complaints of disabling pain). For all of these reasons, the Magistrate Judge concludes that the ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony regarding his pain.

**4.      The ALJ properly relied on the testimony of the vocational expert**

Plaintiff contends that the ALJ improperly relied on the testimony of the vocational expert in light of the evidence presented.

In order to rely on a vocational expert's testimony that a claimant can perform jobs in the national economy, the ALJ must provide the vocational expert with a hypothetical that reflects all of the claimant's limitations. *See Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). In the present case, the ALJ credited the opinion of Dr. Suarez, who opined that Plaintiff would be able to lift 35-40 pounds occasionally and 25-30 pounds frequently, stand/walk/sit with no limitations, reach/handle/finger with no limitations, and travel with

no limitations. (AR 45, 830.) The ALJ also credited the opinion of the Disability Determination Service psychologist, Dr. Tangeman, who opined that Plaintiff would be moderately limited in the ability to complete a normal workweek and to respond appropriately to changes in work setting, but would not be otherwise limited. (AR 45, 741-42.) Dr. Tangeman also noted that Plaintiff's condition had improved with medication. (*Id.*) As stated above, the ALJ's reliance on these medical opinions was supported by substantial evidence. Based on these limitations, the ALJ provided the vocational expert with the following hypotheticals:

> I want you to assume that we have a man here who is a hypothetical person now and he's got this – he's 40 years of age, has a couple of years of education of college. He has the educational background and the work background that Mr. Ramirez has and – but this hypothetical person has some problems and as a result would be limited in what he can do. He's got some back problems, so he would be limited to up to 10 pounds frequency – frequently and 20 pounds on an occasional basis. Other than that, he's got pain in various parts of his body including his head, his back, his shoulders, elbows and hands, and wrists with some occasional numbness in his fingers and hands. Now, for the first hypothetical, I want you to assume that this condition of pain and numbness is of a slight nature and would have a slight effect on his ability to do basic work activities or that condition is or can be controlled by appropriate medication without significant adverse side effects. . . . Let me give you hypothetical person number two. All factors are the same as hypothetical one except now the pain level and the psychiatric problems would be normally of a moderate nature and would normally have a moderate effect on his ability to do basic work activities; however, these conditions are all controlled by appropriate medication without significant adverse side effects. . . . Hypothetical four, let me overlay one other factor over both hypothetical persons number one and two. I – let us assume that the hypothetical person number four also in addition to those factors in one and two also had a limitation that he can only occasionally grasp and grip with both hands.

(AR 1006-1010.) In response to hypothetical four, the vocational expert testified that Plaintiff would be able to perform his past relevant work as a customer service representative. (AR 1010.) She testified that, as a customer service representative, Plaintiff would not be required to grip and grasp frequently. Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was able to perform his past relevant work as an customer service representative.

The ALJ provided the vocational expert with a hypothetical that reflects all of Plaintiff's limitations. In fact, the fourth hypothetical (upon which the ALJ ultimately relied

in concluding that Plaintiff could perform his past relevant work) described a person with greater limitations than Plaintiff: while Dr. Suarez opined that Plaintiff would be able to lift 35-40 pounds occasionally and 25-30 pounds frequently, the ALJ assumed a hypothetical claimant who was limited to up to 10 pounds frequently and 20 pounds on an occasional basis. The ALJ also assumed that the hypothetical claimant had limitations in gripping/grasping, despite Dr. Suarez's opinion that Plaintiff could reach/handle/finger with no limitations. Accordingly, the Court concludes that the ALJ appropriately relied on the testimony of the vocational expert.

## RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, enter an order DENYING the relief requested by Plaintiff in his opening brief (Doc. No. 14).

Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within 10 days after being served with a copy of this Report and Recommendation. If objections are not timely filed, the party's right to *de novo* review may be waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003) (en banc), *cert. denied*, 540 U.S. 900 (2003). If objections are filed, the parties should direct them to the District Court by using the following case number: **CV 08-521-TUC-FRZ.**

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 22nd day of September, 2009.

Jennifer C. Guerin
United States Magistrate Judge

- 23 -